UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD ABBOTT,<br>    Plaintiff,<br><br>v.<br><br>JANE RABE, & MICHAEL<br>FREDRICKSON,<br>    Defendants | AMENDED COMPLAINT<br><br>C.A. NO.:  04 10777 PBS |

### INTRODUCTORY STATEMENT

This case concerns employees of a state agency, the Board of Bar Overseers (BBO), acting under color of state law, violating the Plaintiff's, attorney Richard Abbott, civil and constitutional rights including the first, fifth, sixth and fourteenth amendments.  The defendants jointly or severally also lied about relevant information as well as failing to investigate, supervise, and neglecting the case at hand.

At all pertinent times, from the mid 1990s through May of 2001, Michael Fredrickson was general counsel for the BBO, with several attorneys and administrative assistants working under his supervision.  During this time frame, attorney Fredrickson wrote novels during his business hours as BBO general counsel, including requesting his administrative assistants to perform novel-related tasks for him.  This was not made known to the Plaintiff or the public until Autumn of 2003 when the Massachusetts State Ethics Commission released their decision.  The Commission found, with Fredrickson's agreement, that Fredrickson violated Massachusetts conflict of interest laws.  He was ordered to pay $5,000.00 (five

thousand) to the State Ethics Commission as well as $5,000 to the BBO.

In August of 1995, pursuant to a complaint by Oscar Atehortua, a convicted drug dealer, the BBO began an investigation of attorneys Richard Abbott and Jeffrey Denner. In 1998 bar counsel Jane Rabe, was the second wave of bar counsel on the case. The first, experienced bar counsel Yvonne Toyloy and bar investigator Laura Flores, had investigated the complaint for over two years and never brought charges against attorney Abbott, even though he had relinquished the case by the end of 1995.

The nub of the BBO's complaints against the Plaintiff stemmed from him performing a somewhat original strategy which assistant bar counsels didn't understand, or claimed they didn't. Assistant bar counsel Defendant Rabe said she was going to get an expert witness to prove Abbott was negligent. She never could obtain such an expert. Less than a week after Atehortua was deposed, Rabe made a Motion in Limine to exclude Abbott's expert witness. It wasn't until the day of the hearing May 28, 1999 that Defendant Rabe conceded that Abbott's strategy was acceptable.

Abbott called an expert witness - which he obtained only after Rabe's representations that she was getting one - who testified that Abbott performed exceptionally by providing Atehortua excellent representation.

Both assistant bar counsels Rabe and Toyloy made serious unsubstantiated charges against Abbott that were easily discoverable with a minimum of investigation. Toyloy falsely accused Abbott of constantly lying to the state Appeals Court for three years by asking for continuances based upon waiting for the trial judge to rule on Atehortua's Motion For A New Trial - a Motion, according to Toyloy, Abbott never made. Abbott of course made such a Motion. It has never been explained why Toyloy or her supervisor didn't check this damning accusation with Oscar Atehortua, his co-defendant Jaime Atehortua, co-defendant's attorney, or the clerk of Suffolk Courts.

Toyloy discovered she was wrong about the Motion For A New Trial, her primary theory of Abbott's wrongdoing, but did not drop the case. Instead it was turned over to assistant bar counsel Defendant Rabe. Rabe had her own original and incorrect theories. She claimed Abbott had Atehortua sign a blank piece of paper which Abbott later filled in to his benefit. When deposed, even Atehortua admitted that never happened. Prior to his deposition, Rabe interviewed Atehortua twice in prison. It has never been explained why Rabe didn't ask Atehortua about her serious charge at either of her prison interviews with him.

Assistant bar counsels had to report their investigations, or failures to investigate to supervisor and general counsel Defendant Fredrickson. Fredrickson did not conduct reasonable supervision or investigate why Toyloy made serious false accusations

-3-

against Abbott, why Toyloy and Rabe proceeded in bad faith against Abbott which he complained about in writing several times, claiming, among other things, Toyloy ignored the facts and was looking to find him liable at any cost, why Rabe made serious false accusations against Abbott as well as violating the BBO's own rules in proceeding against him. Bar investigator Laura Flores had been investigating the case for several months when at the May 24, 1996 deposition of Abbott she claimed that Abbott's strategy of passing on the worthless direct appeal and concentrating on the Motion For A New Trial left Atehortua with no post conviction remedies.

Flores later backed off that statement when she was challenged by Abbott. Three years later she testified that the Atehortua case may not have been her most consuming passion at the time for shortly after the May 24th deposition she took a leave of absence to study for the bar.

Equally as disturbing is that the BBO never timely interviewed an impartial crucial witness who could have resolved the case. In September of 1995 Abbott visited Atehortua with an impartial translator - it was uncontested Abbott found him in the Yellow Pages and met him for the first and only time at the prison just before going to interview Atehortua.

Abbott wrote to Toyloy the very next day after the interview that he went with a translator and that Atehortua knew all along what strategies were being followed and that Atehortua liked and agreed with them.

Rabe also lied to the Massachusetts SJC concerning important issues of the case. The charges against Defendant Rabe are documented or taped. Except for the lying to the SJC, Defendant Fredrickson aided or abetted Defendant Rabe as charged below. The negligence per se, negligent supervision, and abuse of process Counts are solely against Fredrickson.

## JURISDICTION AND VENUE

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S. C. A. 1332 because, as alleged below, there is complete diversity of citizenship between the Plaintiff and all Defendants in a negligent, negligence per se, and negligent supervision action and the matter in controversy, exclusive of interests and costs, exceeds the sum of seventy-five thousand dollars.

2. Jurisdiction is also conferred upon this Court pursuant to 28 U.S.C.A. 1331 and 1341 because the matters in controversy arise under the Constitution and laws of the United States and at all relevant times the Defendants acted under color of state law as state employees acting within the course and scope of their employment and are being sued in their individual capacities.

3. Venue is proper in this Court under 28 U.S.C.A.1391 (b) because the events that give rise to the Plaintiff's claims took place within Boston, MA and vicinity, the Division of this District Court sitting in Boston.

## PARTIES

4. From the mid 1990s through May 7, 2002, Defendant Michael Fredrickson served as the Board of Bar Overseers general counsel and upon information and belief he was responsible for supervision of assistant bar counsels Yvonne Toyloy and Defendant Jane Rabe in their work at the BBO.

5. Upon information and belief during the mid 1990s through the present, Defendant Fredrickson was a citizen and resident of Massachusetts and from 1995 through April 2001 he wrote novels on the job, during business hours when his job description called for, among other things, supervising assistant bar counsels in their investigations and filing of petitions.

6. Upon information and belief, Defendant Jane Rabe was at all pertinent times and continues to be a resident and citizen of the Commonwealth of Massachusetts. She was the assistant bar counsel who continued to investigate a complaint against the Plaintiff, making false representations, even after the first bar counsel, Yvonne Toyloy, investigated the case for over two years and never brought a formal charge against the Plaintiff.

7. The Plaintiff, Richard Abbott, is a resident and citizen of the state of New York. On September 12, 2001 he was suspended for thirty months from practicing law in the Commonwealth of Massachusetts. He exhausted all his administrative remedies and is within the three year statute of limitations on all claims.

## FACTUAL ALLEGATIONS

8. In parts of 1990 and 1991 the Plaintiff rented office space in Newton, MA from

attorney Jeffrey Denner.

9. Abbott handled approximately a dozen cases involving post conviction relief which he obtained from attorney Jeffrey Denner. These cases were either Denner's trial cases or post conviction relief work that Denner obtained.

10. The post conviction relief work included direct appeals, and sundry motions, including Motions For A New Trial.

11. Denner enlisted Abbott's help to handle Oscar Atehortua's post conviction relief.

12. Oscar Atehortua was from a large family and Denner had performed work for the Atehortuas in a narcotics related case.

13. In March of 1991 Denner obtained a signature on a fee agreement to represent Oscar Atehortua, signed by one of Oscar's relatives on behalf of Oscar.

14. The fee agreement called for Oscar to potentially pay $18,000. $9,000 for Denner to read and report on the transcripts, another $9,000 if Denner felt there were any viable issues for post conviction relief. Both parts of the agreement were for a flat fee, not by the hour.

15. At that time Abbott did not know Oscar or any of the Atehortuas.

16. At different times several attorneys who worked for or rented space from Denner visited Oscar Atehortua.

17. Atehortua did not want any of them to work on his case except for the plaintiff.

18. Abbott read Oscar's transcripts several times. Oscar was tried with his cousin co-defendant Jaime Atehortua.

19. Oscar and Jaime Atehortua were the subjects of one of the largest surveillances

in Massachusetts history. They were watched from a camera on a telephone poll, watched in the streets by undercover agents, and the subject of over four hundred (400) wire taps.

20. Abbott believed the Atehortuas were convicted largely on wiretaps, in English, between Oscar and convicted drug dealer Patrick Seeley. They were trying to set up a date and time for a drug deal.

21. Jaime was bilingual but Oscar claimed his English was limited, although he was speaking fluent English on the wire tap to Patrick Seeley, even using code words.

22. These wire tap tapes were introduced into evidence at the trial by police officers who were familiar with the voices of the Atehortuas and Patrick Seeley.

23. Some of the code words Oscar used for one kilo of cocaine were "one employee to go" and " one employee working".

24. At the time of the tapes Oscar was unemployed.

25. A large part of the underpinnings of defendant Rabe's claim was that Abbott took advantage of an ignorant man who couldn't read, write, and could barely speak English and who couldn't read or write Spanish, according to Rabe.

26. Assistant bar counsel Yvonne Toyloy, the first bar investigator on the case, felt that the Plaintiff lied to the Massachusetts Appeals Court when the Plaintiff asked for Motions for Continuances based on his waiting for trial judge Mulligan to hear the Motion For A New Trial.

27. On May 15, 1996, Toyloy deposed Denner for the first and only time. By the end of the deposition Denner had satisfactorily answered her questions except for

two concerns.

28. Toyloy couldn't understand why Abbott had visited Atehortua so many times in prison in 1992 and 1993 even though he was working on a flat fee.

29. Denner said Abbott wanted to be painstakingly clear that Atehortua knew what was going on.

30. The other concern of Toyloy was her strong feeling that Abbott had never filed a Motion For A New Trial.

31. On May 24, 1996, nine days after Denner's deposition, Toyloy deposed Abbott for the second time out of four total times by the BBO. She agreed that Abbott had made a Motion For A New Trial and that issue was never raised again.

32. By May 24, 1996 Toyloy had been investigating the case for about nine months with her bar investigator Laura Flores. No one has ever explained why Toyloy (now deceased) never spoke to Oscar Atehortua, co-defendant Jaime Atehortua, co-defendant's attorney who was local to the Boston area or the Suffolk County clerk of Courts, all who verify that Abbott was at the October 1993 hearing on the Motion for A New Trial and made such a Motion.

33. Months before the May 1996 deposition, Abbott visited Atehortua in prison and was met there by an impartial translator, one Abbott obtained from the Yellow Pages.

34. The visit with the impartial translator present took place September 28, 1995. It is uncontested that the very next day, September 29, 1995, Abbott wrote to Toyloy that he visited Atehortua in prison with a translator and Atehortua knew all along about the strategy of passing on the worthless appeal and instead

concentrating on his Motion For A New Trial.

35. It was only in a Motion For A New Trial that the best issue, the "two Oscar" issue and the resulting reasonable doubt of identification could be raised.

36. Atehortua had two other issues, neither as good as the "two Oscar" issue, but they also should have been raised in the Motion For A New Trial.

37. Whether Atehortua knew of Abbott's strategy was a big issue for the BBO.

38. Although Toyloy testified that she knew that everyone who visited a prison was required to register their name and address, she never contacted the impartial translator to discover what he had heard from Atehortua during the September 28th interview.

39. No one from the BBO contacted the impartial translator until years later when he claimed he had forgotten all he had heard years before at Atehortua's interview.

40. Assistant bar counsel Defendant Jane Rabe also accused the Plaintiff of having Atehortua sign a blank piece of paper which the Plaintiff later fill in.

41. At Atehortua's May 5, 1999, his only deposition, even Atehortua had to admit Abbott never had him sign a blank piece of paper.

42. Still, Rabe kept this charge in her petition, not volunteering to withdraw it until the fourth day of the hearing.

43. The hearing lasted 4 non consecutive days, beginning on May 28, 1999 and ending on June 5, 2000.

COUNT I - U.S. Constitution, Amendments 1st, 5th, 6th, and 14th, incorporated through 42 U.S.C.A. 1983.

44. At the SJC appeal on May 7, 2002, Defendant Rabe lied to the SJC about, among other things, the important issue concerning Atehortuas correspondence to Abbott and whether Atehortua knew he was getting a Motion For A New Trial, not a direct appeal.

45. Abbott claimed the BBO's continuing untoward actions evidenced their bias and unfair treatment towards him.

46. Abbott often complained orally and in writing about this unfair treatment and felt that part of Toyloy, Defendants Rabe and Fredrickson's actions were due to how insistent he was about exercising his rights, including the First Amendment right to freedom of speech and to petition the government for a redress of a grievance.

47. At the SJC argument on May 7, 2002 Rabe was questioned about whether Atehortua wanted a direct appeal. She made this crucial untruthful statement:
"And it's in _every_ letter he wrote to his lawyer. What has happened? I'm not satisfied with the pace of my appeal, letter after letter. It's in the evidence."

48. Atehortua wrote nine letters to Abbott. At the beginning of the correspondence Abbott was first formulating a strategy on how to proceed. The direct appeal was mentioned but after the first couple of letters, predominantly the Motion For A New Trial is mentioned and the direct appeal isn't brought up.

49. Atehortua first wrote to Abbott on November 7, 1991, where he is concerned about obtaining his tapes at trial. There is no mention of either the appeal or a Motion For A New Trial.

50. The next letter January 23, 1992, Atehortua does complain about the pace of his appeal.

51. The next letter, March 3, 1992, Atehortua doesn't mention the direct appeal but toward the end of the letter writes, "The attorneys {trial attorney} failure to object to the introduction of the Id. card should be addressed in the rule 30".{Motion For A New Trial}.

52. The next letter, April 24, 1992, Atehortua complains that Denner has done little for his $9,000 fee. He does mention appellate duties then writes, "I want to see at least a draft rule 30 with memorandum and affidavit before I give you additional moneys."

53. There is an unsigned May 11, 1992 letter which Abbott contends he never received. In this letter there is no mention of a direct appeal, rather: "What is the problem with showing me a draft Rule 30, memorandum and affidavit before I pay you and Denner additional money."

55. The next letter May 17, 1992, again complains about the financial arrangements and mentions again "a draft rule 30, affidavit and memorandum".

56. The last three letters concern themselves with the Motion For A New Trial (rule 30) and the trial judge Mulligan denying him his rights due to delay on the Motion For A New Trial. The direct appeal is never mentioned.
(February 15, 1993 letter).

57. The July 1, 1993 letter does mention the appeals court **but only** for the purpose of filing a writ of mandamus in order to get Judge Mulligan to act on the Motion For A New Trial. The direct appeal is not mentioned.

58. The final letter of July 11, 1993 has Atehortua mentioning a recent U.S. Supreme Court case and it's benefits to him. The letter ends with, "So please file a motion to amend the present motion for new trial in the superior Court to include this issue." The direct appeal is not mentioned.

59. It is hardly "every letter" or "letter after letter" complaining about the delay of the direct appeal. In fact the majority of letters never mention the direct appeal but most letters mention the Motion For A New Trial.

60. Rabe lied again concerning the important issue of Abbott's credibility.

61. Abbott contended he filed a Motion to Reinstate the direct appeal because of Denner's insistence.

62. Once Denner found the direct appeal had been dismissed he asked Abbott to file a Motion to Reinstate so it could be **withdrawn**. Denner felt it looked better that way.

63. Abbott could see no harm in doing that since he was not going to argue the direct appeal anyway. Abbott made the Motion and filed a brief with it.

64. At the SJC hearing Rabe stated that Abbott never filed the brief, and when at the first BBO interview of November 20, 1995 when Toyloy "confronted" him with the appellate docket dates, he withdrew his position.

65. Abbott was never certain about the dates, even before Toyloy "confronted" him but he certainly didn't withdraw or change his position on whether he filed a brief.

66. In the "confrontation" there is no mention of whether the brief was filed, only the date.

67. Here is the transcript: YT: The motion to reinstate the appeal had been denied

already.

RA: That could be - I'm not ... I'm not certain about the --

YT: Well, it is. I have the docket sheet right here --

RA: I don't deny that. Then, if that's what it says --"

68. The above is the extent of the "confrontation". After that the discussion moved on to what Denner told Toyloy without Abbott present.

69. In talking to Toyloy prior to the November deposition, Abbott was wary of the BBO and thought they were, at best, incompetent as he discovered they hadn't yet spoken to the impartial translator.

70. In fact shortly after Toyloy "confronts" Abbott, she lies and tries to trick him regarding his theory of the case.

71. In the first BBO deposition of November 20, 1995, and even before, Abbott was consistent that his theory was to wait for Jaime's appeals, direct and the appeal from the Motion for a New Trial, to be dismissed before he proceeded with Oscar's appeal from the Motion For A New Trial.

72. Here is his discussion with Toyloy on November 20, 1995:

RA: Well, the appeal is pending right now.

YT: The appeal is dead.

RA: Jaime's appeal.

YT: Right.

RA: Is going to be argued December 1st, is my understanding ... is my understanding.

73. Abbott was correct, Jaime's appeal was still pending and scheduled to be argued in December, although Toyloy falsely stated otherwise.

74. After Abbott's statement about the December argument, Toyloy immediately changed the subject and never brought up Jaime's appeal again.

75. At the BBO hearing, expert witness Michael Traft testified that Abbott's strategy was sound and provided Atehortua with "the best of both worlds" as Abbott was able to read what the Appeals Court reasoned concerning Jaime's appeal. Abbott could tailor his own appeal from the denial of the Motion For A New Trial based on Jaime's decision.

75a. Abbott's theory was good theoretically as well as practically - Traft cited cases where he had seen the theory work in practice.

76. Co-defendants Jaime and Oscar had virtually identical appeals except for the "two Oscar theory".

77. Defendant Rabe made a Motion In Limine to exclude expert witness Traft's testimony.

78. This Motion was mailed on May 10, 1999 after the deposition of Atehortua on May 5, 1999.

79. This Motion was made even though in February of 1999 Rabe, at a meeting with hearing panel chairman Larry David and the Plaintiff, represented she was getting an expert witness to prove Abbott was negligent.

80. Abbott asked for an extra week beyond the time allotted for the witness list to obtain an expert of his own.

81. Rabe never did obtain an expert to show Abbott was negligent.

81a. Defendant Rabe's manipulations and lying were in direct retaliation to Plaintiff exercising his First Amendment right to free speech including his right to petition the government for grievances, she did not properly investigate the case, exhibited impermissible bad faith and bias, arbitrariness and caprice, and this conduct jointly or severally directly and proximately harmed the plaintiff resulting in violations of procedural and substantive due process, rendering effective assistance of counsel impossible. The Plaintiff has been greatly harmed by the defendant's conduct.

## COUNT II, U.S. Constitution, Amendments 5, 6, and 14

82. Plaintiff realleges paragraphs 1 through 81.

82a. At the hearing Plaintiff's counsel objected to Atehortua's videotape deposition coming in. Months earlier Abbott consented to Atehortua being deposed but had no idea his videotaped deposition would be introduced if he was available.

83. The videotape deposition was especially lengthy as questions were asked in English, translated into Spanish, then translated back into English.

84. This videotape was sent to Plaintiff's counsel a couple of weeks before the hearing.

85. The streamlined written deposition where questions and answers were only in English was not provided to counsel until the day of the hearing.

86. The hearing panel and Defendant Rabe violated the BBO's rules 3.7 : "(a) Avoidance of Delay. All formal proceedings shall be as expeditious as possible, and all times shall be mandatory and not discretionary."