87. Rabe was the only party who wanted to depose Atehortua and scheduled it for May 5, 1999. In addition to not providing the streamlined transcribed deposition until the day of the hearing, Rabe changed the theory of the case after Atehortua's deposition but prior to the hearing, which was about three weeks after the deposition (even less after her Motion In Limine) and afforded no time for the plaintiff to depose or re-question Atehortua.

88. Rabe's Motion In Limine of Abbott's expert witness was argued just prior to opening statements. Her motion was rejected by the hearing committee who allowed expert witness Traft to testify on negligence but not on his ultimate opinion that Abbott had done nothing wrong.

89. Because of the tight time frame orchestrated by Defendant Rabe, and her changing of her theories, the Plaintiff was denied an effective confrontation of the complaining witness.

90. Confrontation of witnesses not only attaches for criminal trials.

91. Right of confrontation of witnesses, especially the complaining witness attaches in all areas where administrative and regulatory actions come under scrutiny. Greene v. McElroy, 360 U.S. 474, 497, 79 S.Ct. 1400, 1414 (1959).

92. Rabe also violated the BBO rules. Section 2.1 (b) (1) of the BBO rules states that bar counsel "shall undertake and complete an investigation of all matters involving alleged violations of the Disciplinary Rules."

93. Rabe alleged in her petition that Abbott had Atehortua sign a blank piece of paper which Abbott later filled in.

94. At his deposition, even Atehortua admitted that never happened.

95. Prior to his May 5, 1999 deposition, Rabe interviewed Atehortua twice in prison yet remarkably never asked him about this serious charge.

96. In a timely manner prior to the hearing Abbott requested nine interrogatories including did Atehortua claim that Abbott had him sign a blank piece of paper?

97. Upon information and belief Rabe objected to these interrogatories and they were not allowed by Defendant Fredrickson who made the determination not to grant them.

98. This had a chilling effect on Abbott who was not allowed any discovery.

99. Abbott was deposed four times, twice by Toyloy, twice by Rabe.

100. Rabe also subpoenaed Abbott's computer which had virtually all his files.

101. The reason for the subpoena of Abbott's computer and printer was ostensibly to show that Abbott had written a letter to Atehortua on his new computer, years after he was suppose to have written it.

102. The BBO computer expert did not find that.

103. At the hearing, over objection Atehortua's videotaped deposition was allowed in in full, despite the delay and the streamlined deposition being available.

104. Many other exhibits were allowed in but never referenced or presented in full or in part.

105. At the time of his deposition being played in full, inmates were customarily allowed to attend hearings and depositions.

106. Rabe never made a showing that Atehortua was unavailable or that he was even still in prison.

107. In contrast to Defendant Rabe, co-defendant's court appointed counsel, Adam

Nussenbaum, wanted to make sure he acted reasonably.

108. He hadn't done many appeals up to that point and took advantage of the Committee for Public Counsel Service's mentor program.

109. By happenstance the mentor appointed to him in 1991 was the same attorney who represented Abbott in 1999, Robert Sheketoff.

110. In 1999 attorney Sheketoff did not remember in 1991 giving advice on Jaime Atehortua's case as it was of such a garden variety nature.

111. Attorney Nussenbaum testified that when he consulted Sheketoff with a synopsis of the case, Sheketoff said Nussenbaum had to make a Motion For A New Trial.

112. Nussenbaum also consulted other experienced attorneys from CPCS appellate section. They all told Nussenbaum to make a Motion for A New Trial.

113. When the Plaintiff initially read and reread the transcripts of the Atehortuas trial he realized the need for a Motion for A New Trial, as the best theory, the "two Oscar" issue could only be raised on a Motion For A New Trial.

114. There was another potential good issue - the trial attorneys hadn't listened to potentially exculpatory tapes in Spanish that weren't presented at trial.

115. This could also only be raised by a Motion For A New Trial.

116. When the tapes were translated into English they were found to be neutral.

117. The Massachusetts Appeals Court denied Jaime Atehortua's consolidated Motion For A New Trial and Direct Appeal, applying appellate rule 1:28.

118. Rule 1:28 allows the appellate judges to refrain from recording an opinion when the matter before them is so ordinary or of so little merit.

118a.  The Defendants direct and proximate acts violated the Plaintiffs right to procedural and substantive due process, displayed impermissible bias and bad faith, arbitrariness and caprice, rendering effective assistance of counsel impossible. Plaintiff has been greatly harmed as a result of the Defendants' conduct.

### COUNT III - U.S. Constitution, Amendments 5, 14

119.  Paragraphs 1-118 are realleged.

120.  In addition to Toyloy falsely claiming the Plaintiff never made a Motion For A New Trial and Defendant Rabe falsely claiming Abbott had Atehortua sign a blank piece of paper, and Defendant Rabe not properly investigating the theory or other aspects of the case, she also claimed Abbott forged or had someone from Denner's office forge Denner's signature on the May 6, 1992 letter.

121.  In his nine interrogatories which were all not granted, Abbott asked if Oscar Atehortua claimed Abbott forged Denner's signature.

122.  Atehortua never claimed Abbott forged Denner's signature.

123.  The first wave of bar counsel and bar investigator never claimed Abbott forged Denner's signature.

124.  Upon information and belief, this theory was an invention purely of Defendant Rabe.

125.  Commonsense indicated Abbott didn't forge Denner's signature, for when Abbott told Denner about Rabe's charges he asked why would any one use his signature as a testimonial for Oscar Atehortua, as Atehortua didn't like him, Denner. The alleged forgery was about two weeks **after** Atehortua wrote to Abbott

to complain that Denner had done nothing for his $9,000 and he wanted Abbott to proceed alone on the remaining $9,000 of the contract.

126. There are many details supporting Abbott's theories throughout but not listed herein for length reasons.

127. When questioned about the letter that had Abbott's and Denner's signature, Denner said he didn't feel it was his signature.

128. But Denner also claimed he didn't sign the vast majority - about ninety-five (95) percent - of the letters that left his office bearing his signature.

129. Denner was busy and had tried cases in 40 different states and several countries, usually not having time to sign his letters.

130. He testified there were even times his secretary signed his checks for him, using his signature.

131. Upon information and belief Rabe never interviewed any employees from Denner's office to see if they signed the letter in question using Denner's signature at Abbott's request or overheard any such request.

132. Defendant Rabe's allegations, like her others, were arbitrary and capricious, bad faithed and biased, without foundation and an exercise originating with her not the complainant or the first wave of bar counsel or bar investigator, and part of her overall strategy to unjustifiably besmirch the Plaintiff in violation of procedural and substantive due process. Defendant Fredrickson knew or should have known about her bias, bad faith and failure to investigate..

133a. As a direct and proximate result of the defendants' actions, the Plaintiff has been greatly damaged.

## COUNT IV - U.S. Constitution, Amendments 5, 6, 14.

133b. Paragraphs 1-133 are realleged.

134. Denner and Abbott were attorneys comparatively situated.

135. They both did primarily criminal defense work.

136. Abbott rented office space from Denner in 1990 and 1991.

137. Denner gave parts of the Atehortua case to Abbott as Abbott did not know any of the Atehortuas when Denner and Oscar Atehortua entered into a fee agreement.

138. Atehortua signed a complaint against both Denner and Abbott.

139. Defendant Rabe's theory of Atehortua's claim was that Atehortua paid Denner $9,000 of an $18,000 contract, and an additional $3,000 of the remaining $9,000 for Abbott to do a direct appeal.

140. The first $9,000 was, according to Rabe, for a review of the transcripts and for a Motion For A New Trial.

141. It is uncontested that Denner received all $9,000 for the first part of the fee and Abbott received none.

142. Denner visited Atehortua in prison once around 1991 or 1992.

143. Abbott visited Atehortua in prison six (6) times in 1992 and 1993.

144. Denner never wrote any briefs or memoranda, either for the direct appeal or the Motion For A New Trial.

145. Abbott wrote , he believes, at least seven memoranda drafts for a Motion For A New Trial, although he could only prove he wrote five memoranda.

146. Abbott was vigorous in trying to get a New Trial hearing before the trial judge, writing his clerk several times, calling him, and visiting him at Suffolk

Superior Court as well as writing to the chief clerk.

147. Denner had no communications with Judge Mulligan's clerk and made no effort to get Oscar Atehortua a hearing for a Motion For A New Trial.

148. Abbott argued Atehortua's Motion For A New Trial before Judge Mulligan in October of 1993 and subpoenaed a witness to the proceedings. Denner did not attend the proceedings.

143. Denner reviewed the transcripts of Atehortuas' trial.

144. In the thousands of cases Abbott was involved in in Massachusetts, Rhode Island, federal and other state courts, he was once given a private admonition by the Massachusetts BBO in 1989. In that case Abbott admitted he forgot about a case and the deadlines and even wrote an affidavit to that effect be used in federal court to help his client.

145. The Plaintiff does not know what cases, if any, Denner was disciplined for.

146. Denner didn't make a Motion To Withdraw in Atehortua's case until 1994.

147. Atehortua claims that until that time he always thought Denner was his attorney.

148. Abbott was treated far more harshly and disparately then the comparatively situated Denner who received far more money from Atehortua for less work.

149. He offered the Plaintiff no substantive help in Atehortua's post conviction relief other than to say he should file a Motion For A New Trial.

150. Once he discovered Atehortua's direct appeal had been dismissed he told Abbott to make a Motion to get it reinstated and then withdraw it.

151. Upon information and belief, when Denner testified before the hearing

committee, the charges against him had not been dropped.

152. Denner testified incorrectly about a vital point. He claimed that Atehortua's best issue, the "two Oscar" issue could be raised on direct appeal.

153. Denner was an important witness, other than Atehortua, Denner was the only party who was involved from the outset in the case.

154. When the possibility of bias exists, even if remote, the evidence of that is for the fact finders to hear and evaluate. This didn't happen.

155. At the hearing there was no testimony that Denner was still under investigation or when the charges had been dropped, if at all, against him.

156. Upon information and belief, Denner was never disciplined in the Atehortua case.

156a.    Defendant Rabe impermissibly violated the Plaintiff's right to Equal Protection, a fair hearing, and substantive due process and he was greatly damaged as a direct and proximate cause of her actions.

COUNT V- U.S. Constitution, Amendment 14.

157. Paragraphs 1-156 are realleged.

158. Attorney Abbott and attorney Michael Fredrickson were comparatively situated.

159. As an employee of the state, attorney Fredrickson had additional strictures upon him that Abbott did not have.

160. Both Abbott and Fredrickson were charged with violating rules, Abbott the disciplinary rules, Fredrickson the Mass. General Laws, conflict of interest statute.

161. Defendant Fredrickson claimed he didn't violate the conflict of interest laws as he did his BBO work at home, during non business hours.

162. The State Ethics Committee did not believe him for while he kept detailed records of his expenses for novel-related tasks, including paper and stamps, he kept no records of the hours or any other pertinent detail he spent doing BBO related work at home.

163. Defendant Fredrickson was charged with a violation not in just one case as Abbott had been, but of a continuous violation from when he began as general counsel for the BBO from mid 1990s through May of 2001 when his second novel was published.

164. Upon information and belief, Defendant Fredrickson's violations affected dozen of attorneys negatively.

165. Even Defendant Rabe had to finally reluctantly admit that Abbott's strategy of

-25-

passing on the worthless direct appeal was acceptable.

166. Fredrickson was never suspended. His total penalty was ten thousand (10,000) dollars in fines, $5,000.00 to the State Ethics Committee, $5,000.00 to the BBO.

167. Abbott was never offered just fines to settle the charges against him.

168. Upon information and belief, Defendant Fredrickson made more in advances and royalties from his two novels than $10,000.

169. From a purely economic standpoint, Fredrickson was better off writing novels during office hours and collecting his checks from the BBO from the mid 1990s to May of 2001 than just working at the BBO during office hours.

169a. Upon information and belief, Defendant Rabe never sought to investigate Fredrickson for disciplinary violations, nor did any one from the BBO.

170. Defendants violated the Plaintiff's right to Equal Protection and he was greatly harmed as a direct and proximate result of the Defendants' actions.


COUNT VI- U.S. Constitution, 5, 14th Amendment

171. Paragraphs 1-170 are realleged.

171a. Defendant Rabe claimed the Plaintiff "abandoned" Atehortua.

172. Upon information and belief, successor counsel went far longer without aiding Atehortua and he, attorney John Doe, received no disciplinary action.

173. On May 5, 1999 at Atehortua's deposition, both Atehortua and Defendant Rabe claimed Atehortua had an attorney they weren't able to name.

174. Defendant Rabe claimed she couldn't remember the name, although she had written it down somewhere.

175. She never provided that name to the Plaintiff.

176. This was in violation of the Massachusetts rules of Civil Procedure which provides that discovery shall be continuing and the parties have a duty to turn over information to the other side.

177. Three years after the May 5, 1999 deposition, on May 7, 2002, Defendant Rabe told the SJC nothing had been done yet on Atehortua's case; the Motion For A New Trial was still pending before judge Mulligan.

178. In October of 1993 Abbott argued a Motion For A New Trial before Judge Mulligan.

179. At that hearing Abbott introduced into evidence a wiretap transcript that allegedly showed there was another Oscar Atehortua (Oscar Jesus), not the complainant, Oscar Ernie, both living at the same address.

180. Abbott also subpoenaed a witness to the hearing, a restaurant manager and her pertinent documents, that showed Oscar Jesus Atehortua applied for a job at Biba's restaurant and he gave his address as 29 Bennington Street in East Boston, the same address as Oscar Ernie Atehortua.

181. This job application was also introduced into evidence at the Motion For A New Trial hearing.

182. At the end of the hearing Judge Mulligan expressed interest in the "two Oscar" theory and wanted a hearing with the trial attorney present to discover why he didn't introduce into the trial evidence of the other Oscar Atehortua living in the same apartment as the complainant.

183.    Prior to co-defendant Jaime Atehortua's appeal being decided, Abbott contacted Oscar Atehortua's trial attorney.

184.    Abbott found him hostile and realized it would be counter productive to call him to a hearing.

185.    Abbott decided the best strategy would be to get a rubber stamp denial of the Motion For A New Trial and take that up on appeal with the documents in evidence of the other Oscar Atehortua.

186.    Expert witness Michael Traft testified before the hearing panel that the last thing you wanted to do was call a hostile trial attorney as witness.

187.    Attorney Denner also testified that was not an advisable strategy.

188.    Before Jaime's appeal was decided , Abbott was off the case.

189.    On November 20, 1995 Abbott told Toyloy he was inactive.  The BBO said they'd inform Atehortua.  Toyloy advised Abbott he could no longer proceed in any case if he was inactive.

190.    Abbott didn't feel it was right in any event to proceed on a job when the client had complained to the BBO.

191.    On March 12, 1996 Jaime's consolidated appeal was denied.

192.    Shortly after, in April of 1996, Abbott wrote to Atehortua, believing the BBO had told him Abbott was inactive, to inform him Jaime's appeal had been denied and asking him how he wanted to proceed, e.g. did he want his file sent to him or to a relative, did he want a recommendation for another attorney, etc.

193.    At no place in the letter did Abbott ask Atehortua for money.

194. Atehortua did not respond to the letter or in any way communicate with the Plaintiff.

195. On May 3, 1996 Abbott again wrote to Atehortua, again asking him what he wanted done.

196. In this letter Abbott told Atehortua he was inactive, as Abbott realized the BBO may not have told that to Atehortua.

197. Atehortua did not respond to this letter either or in any way seek to communicate with Abbott.

198. In the summer of 1996, the Superior Court contacted Abbott and asked him to make a Motion To Appoint New Counsel for Atehortua. Abbott made the Motion, which was granted.

199. In April of 1998 Defendant Rabe contacted Abbott and asked him to withdraw. Abbott thought he had been out of the case since late 1995, but nonetheless agreed to withdraw.

200. From the summer of 1996 until the Spring of 1998 no one contacted Abbott concerning Atehortua - not Atehortua, his relatives, friends, the Courts, the BBO, or any other private or public person or organization.

201. Upon information and belief, Atehortua's successor attorney, John Doe, and Abbott, were comparatively situated as attorneys.

202. Upon information and belief the BBO did not discipline attorney John Doe or even seek to, even though he went a minimum of three years without getting a decision from Judge Mulligan on Oscar Atehortua's Motion For A New Trial.

203. Upon information and belief Defendant Rabe intentionally did not provide the Plaintiff with the successor attorney's name for fear he would contend that Abbott had done a good job.

204. As a direct and proximate result of the Defendants' actions the Plaintiff was greatly harmed.

### COUNT VII - U.S. Constitution, Amendments 5, 14

205. Paragraphs 1-204 are realleged.

205a. Atehortua's complete videotaped deposition was played into evidence over objection.

206. Atehortua's testimony was so riddled with contradictions that the hearing panel labeled it "confused and confusing" and decided not to credit any of Atehortua's testimony.

207. The panel frequently ignored their own written imperative by crediting Atehortua's testimony - but only when they had to.

208. For instance, the BBO petition claimed Atehortua's cousin gave Abbott $3,000 as down payment for the direct appeal in November of 1993.

209. Abbott claims the $3,000 was for the Motion For A New Trial and it probably wasn't November.

210. At his deposition, Atehortua claimed it wasn't actually his cousin as he had represented to Abbott and as was alleged in the BBO petition, it was really his girlfriend's brother.

-30-

211. He never offered an explanation why he lied about the identify of the go-between.

212. In short, to find against the Plaintiff the hearing panel had to rely on hearsay, maybe even quadruple hearsay (the brother told the sister who told the cousin who told Atehortua) from a man who was deemed "confused and confusing" when he testified directly.

213. Defendant Rabe pushed for a November 1993 payment date which was shortly after the Motion For A New Trial hearing with Judge Mulligan as it "showed" that Atehortua made the partial payment for a direct appeal.

214. The Plaintiff still claimed it probably wasn't November but if it was it more likely showed Atehortua was pleased with Abbott's presentation at the Motion For A New Trial hearing and was paying him $3,000 for that work as he had written that he wanted to see quality work done on the Rule 30 Motion before paying $3,000.

215. The plaintiff was found liable on shoddy, insufficient evidence of an arbitrary and capricious nature that violated the hearing panels own findings.

216. Defendants did not do an adequate job of investigation and still proceeded on insufficient evidence. The Plaintiff was greatly harmed as a direct and proximate result of their actions.

217. The above example was not an isolated incident but for brevity concerns other details and instances are not included.

-31-

## THE TORT CLAIMS

The general negligence claim is against both defendants as is the infliction of emotional distress. The negligence per se, negligent supervision, abuse of process, are against Defendant Fredrickson only. For all the claims below, jurisdiction is based on diversity, is well within the three year statute of limitations from the SJC judgment in 2002, and it is irrelevant whether the Defendant/s were acting under color of state law.

### COUNT VIII - Negligence per se

218. Paragraphs 1-217 are realleged.

219. Defendant Michael Fredrickson violated Mass. General Laws, c.268A.

220. For his violation of this conflict of interest statute he was fined a total of $10,000 by the State Ethics Commission, $5,000 to go to the State Ethics Commission, $5,000 to go to the BBO.

221. The violation was for shirking his duties at the BBO during office hours and instead working on his novel during office hours from the mid 1990s through May of 2001.

222. During most of that time Abbott was both a member of the Massachusetts general public as well as a member of the Massachusetts bar.

223. Defendant Fredrickson had a legal duty of due care to the Plaintiff which he breached by not acting reasonably in all matters he had to review, investigate, and supervise, including any matters relating to that of the Plaintiff.

-32-

224.   Defendant Fredrickson shirked those duties regarding the Plaintiff, substantially because he was not attentive to them during business hours.

225.   As a direct and proximate cause of Defendant Fredrickson's negligence per se, the Plaintiff suffered damages, exclusive of costs and attorney's fees, in excess of $75,000.00 (seventy-five thousand).

## COUNT IX- Negligence

226.   Paragraphs 1-225 are realleged.

227.   Throughout her investigation of the Plaintiff, Defendant Rabe did not perform a reasonably prudent investigation.

228.   She charged the Plaintiff with serious allegations which could have been detected with a minimum of investigation, including that he signed a blank piece of paper that he had the complainant, Oscar Atehortua sign.

229.   She also charged him with forging or having Denner's employees forge attorney Denner's signature without doing any investigation of Denner's employees, or if she did she never turned over this exculpatory evidence to the Plaintiff.

230.   She failed to investigate Abbott's strategy of the case, claiming she was going to get an expert witness to prove he was negligent.

231.   She could not obtain such a witness as no expert would testify that Abbott had been negligent in his strategy.

-33-

232. The strategy was easily understandable but although she had been on the case for years, she did not realize it was an acceptable strategy until the day of the hearing.

233. She forsook commonsense theories in favor of remote interpretations that she originated and not even the complainant endorsed.

234. As an assistant bar counsel she owed a duty to the Plaintiff to investigate in a reasonably prudent manner, a duty she breached.

235. As a direct and proximate cause of Defendant Rabe's and Fredrickson's acts, both jointly and severally the Plaintiff was injured in excess of $75,000, exclusive of costs and attorney's fees.

## COUNT X - Negligent Supervision

236. Paragraphs 1-235 are realleged.

237. Upon information and belief, Defendant Fredrickson's duties included investigation and supervision of complaints his assistant bar counsels brought before him.

238. Upon information and belief Yvonne Toyloy was one such assistant bar counsel.

239. She falsely claimed that Abbott lied to the Appeals Court in asking for continuances based on a Motion For A New Trial which he never made.

240. She misrepresented important facts to Abbott and exhibited bad faith to which Abbott complained orally to her and in writing after each time she deposed him.

241. Defendant Fredrickson did not properly investigate these complaints or upon

information and belief even have systems in place to investigate complaints to assistant bar counsels.

242.    Assistant bar counsel Rabe also lied and exhibited bad faith, and again Defendant Fredrickson did nothing to investigate or supervise this.

243.  He owed the Plaintiff a duty of care which he breached.

244.  As a direct and proximate cause of Fredrickson's acts, the Plaintiff suffered damages in excess of $75,000, exclusive of attorney's fees and costs.


## COUNT XI- Abuse of Process

245.  Paragraphs 1-244 are reallaged.

246.  By not properly supervising or investigating when he was suppose to and instead concentrating on writing novels on the job, Defendant Fredrickson misused the process of a bar investigation and petition in a manner which it was not designed to accomplish.

247.  A defendant can be held actionable for abuse of process even if he prevails in some aspects of the underlying actions.

248.  Upon information and belief Defendant Fredrickson abused the process for the ulterior or illegitimate purpose of making it seem he was truly attentive to the investigation so that it would be less discernable he was using state time to write novels and perform novel-related tasks.

249.  As the direct and proximate cause of the Defendants abusing the process, the Plaintiff suffered damages in excess of $75,000.00, exclusive of costs or attorney's fees.

## COUNT XII- Negligent Infliction of Emotional Distress

250.  The Plaintiff realleges paragraphs 1-249.

251.  The Defendants had a duty of care they owed the Plaintiff which they breached. They knew, or should have known, that emotional distress to the Plaintiff was the likely result of their conduct..

203.  The emotional distress suffered by the Plaintiff as a direct and proximate cause of the defendants' conduct will, in all reasonable likelihood, continue from the present into the future and the same is evidenced by physical symptoms.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 (b), Federal Rules of Civil Procedure, the Plaintiff demands a Trial by Jury for all of the issues pled herein so triable.

WHEREFORE the Plaintiff prays for the following relief:

a. Pursuant to Counts One through Seven, and Twelve, judgment against Defendant Rabe in an amount to be determined by this Court for compensatory and punitive damages plus interest and costs, and attorney's fees as allowed by 42 U.S.C.A. 1988.

b. Pursuant to Counts Two through Seven, and Twelve, judgment against Defendants Rabe and Fredrickson jointly and severally in an amount to be

costs, and attorney's fees as allowed by 42 U.S.C.A.1988 and all other remedies this Court deems just.

c. Pursuant to Counts Nine and Twelve, judgment against Defendants Rabe and Fredrickson, jointly and severally, in an amount to exceed $75,000.00, plus interest and costs and any other remedy this Court deems just.

d.   Pursuant to Counts Eight, Ten, and Eleven, judgment against Defendant Fredrickson in an amount to exceed $75,000.00, plus interest and costs and any other remedy this Court deems just.


Respectfully submitted,

*Richard Abbott*  5/3/04


Richard Abbott, Pro Se
72-11 Austin Street
Suite 321
Forest Hills, NY 11375
(917) 971-5005


-37 of 37 pages-