# EXHIBIT A

### IN THE MATTER OF RICHARD D. ABBOTT.

Suffolk. May 7, 2002. - August 1, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Suspension, Disciplinary proceeding. *Due Process of Law,* Administrative hearing. *Administrative Law,* Proceedings before agency. *Evidence,* Administrative proceeding.

In an attorney disciplinary matter, there was no merit to the attorney's claims that he did not receive adequate review of all charges against him, that bar counsel was biased and negligent with respect to his case, or that the admission of a videotaped deposition of the complainant infringed the attorney's right to confrontation. [391-393]

Findings and credibility determinations made by the Board of Bar Overseers in an attorney disciplinary proceeding were fully supported by substantial evidence. [393-394]

This court found no merit in conclusory arguments raised by an attorney regarding the conduct of bar counsel and the Board of Bar Overseers during a disciplinary proceeding. [394-395]

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on July 11, 2001.

The case was heard by *Cowin,* J.

*Richard D. Abbott,* pro se.

*Jane R. Rabe,* Assistant Bar Counsel.

CORDY, J. Richard D. Abbott appeals from an order of a single justice of this court suspending him from the practice of law in the Commonwealth. The matter came before the single justice on the information and record of proceedings as well as the vote and recommendation of the Board of Bar Overseers (board). The board found that Abbott, as appellate counsel to Oscar Atehortua,[1] had neglected his client's postconviction remedies and had made repeated misrepresentations to both his client and bar counsel concerning his handling of the case. The

---

[1] Oscar Atehortua was convicted of trafficking in cocaine in 1990 and sentenced to from fifteen to twenty years.

board recommended, and the single justice ordered, that Abbott be suspended from the practice of law for two and one-half years.[2] We affirm the decision and order of the single justice.

*Prior Proceedings.*

Bar counsel commenced proceedings against Abbott by filing a petition for discipline on August 31, 1998. Abbott filed a motion to dismiss the petition claiming, inter alia, that bar counsel had negligently failed to interview an interpreter who would have provided exculpatory testimony; had lost an exculpatory letter sent by Abbott to Atehortua in August, 1994; and was generally biased against Abbott. The motion was denied by the board on November 6, 1998, as was Abbott's subsequent motion for reconsideration.

On January 12, 1999, the matter was referred to a hearing committee. A prehearing conference was held on February 22, 1999, at which bar counsel filed a motion to take a videotaped deposition of the complainant, Atehortua, who was incarcerated. Abbott assented to the videotaped deposition and the committee issued an order allowing it. A Spanish interpreter was present to assist Atehortua in the deposition and Abbott and his attorney were allowed to cross-examine the complainant.

Hearings were held on four days between May 28, 1999, and February 8, 2000; and on June 5, 2000, the committee filed its report recommending that Abbott be suspended from the practice of law for two and one-half years. Abbott appealed from the report claiming that the committee ignored and misstated relevant evidence and failed to understand basic appellate procedure. Following oral argument and review of the record, an appeal panel of the board filed a report on March 30, 2001, finding no error in the committee's report and recommending that the board adopt the committee's recommendation for

---

[2] Abbott had been previously admonished by the Board of Bar Overseers (board) for similar unprofessional misconduct in 1989 when his failure to file an appellate brief in a deportation matter caused his client's appeal to be dismissed. This conduct violated S.J.C. Rule 3:07, Canon 2, DR 2-110 (A) (2), as appearing in 411 Mass. 1318 (1992), and S.J.C. Rule 3:07, Canon 6, DR 6-101 (A) (2) & (3), as appearing in 382 Mass. 783 (1981), and was considered as an aggravating factor in the board's recommendation of discipline in the current matter.

discipline. Abbott filed objections to the appeal panel's report on April 5, 2001.

On May 14, 2001, the board voted to adopt the appeal panel's report and to recommend that Abbott be suspended from the practice of law for two and one-half years. The board's recommendation was based on its conclusion that Abbott had (1) neglected Atehortua's postconviction remedies in violation of S.J.C. Rule 3:07, Canon 6, DR 6-103 (A) (3), as appearing in 382 Mass. 783 (1981) (lawyer shall not neglect legal matter), and S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (1), (2), & (3), as appearing in 382 Mass. 784 (1981) (lawyer shall not fail to seek lawful objectives of client, fail to carry out contract of employment, or prejudice client); (2) made misrepresentations to Atehortua and bar counsel in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4) & (6), as appearing in 382 Mass. 769 (1981) (lawyer shall not engage in dishonesty, fraud, deceit, misrepresentation, or any other conduct that reflects adversely on fitness to practice); and (3) obtained Atehortua's signature by false pretenses on a November 29, 1995, document and had given false testimony under oath to bar counsel in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), (5), & (6), as appearing in 382 Mass. 769 (1981) (lawyer shall not engage in dishonesty, fraud, deceit, or misrepresentation; or engage in conduct prejudicial to administration of justice, or any other conduct that reflects adversely on fitness to practice).

The single justice heard oral argument on July 25, 2001, and on September 12, 2001, issued a memorandum of decision and ordered that Abbott be suspended from the practice of law for two and one-half years. Abbott appealed to the full court claiming, principally, that the proceedings against him violated due process and that the board's findings were unsupported by the evidence.

*Facts.*

The following facts are drawn from the committee's findings which were adopted by the appeals panel and the board.

Abbott was admitted to the bar of the Commonwealth on January 12, 1983, and from 1983 to 1995 worked as a sole

practitioner with a concentration in criminal appellate work.[8] Between 1990 and 1991 Abbott rented space from Attorney Jeffrey Denner in his Newton office and occasionally performed work for Denner as an independent contractor. On or about March 23, 1991, Atehortua retained Denner to represent him in an appeal from his conviction of trafficking in cocaine. Denner was to be paid $9,000 to review the transcript and materials related to Atehortua's trial and evaluate whether there were any issues worthy of appeal. Denner would then be paid an additional $9,000 for preparing the appeal if meritorious issues were found.

In the spring of 1991, Denner asked Abbott to review the Atehortua transcript with him to determine whether there were any issues for an appeal. From this time forward Abbott assumed primary responsibility for Atehortua's case. Following their review, both Denner and Abbott concluded that there "was certainly something worth going forward on" and identified three primary issues for Atehortua's appeal: (1) there were two persons named "Oscar Atehortua" living at the same address, thereby raising an issue of identification; (2) the trial judge erred in denying a motion to suppress; and (3) Atehortua's trial counsel had been ineffective in failing to review wiretap tape recordings for exculpatory evidence.

On August 2, 1991, Atehortua's direct appeal was entered in the Appeals Court. Denner and Abbott then decided to file a motion for a new trial based on a claim of ineffective assistance of counsel. If the motion for a new trial was allowed, they would proceed to trial and forgo the direct appeal; if the motion was denied, they would consolidate the appeal from the denial with the pending direct appeal from the conviction.

On November 27, 1991, Abbott visited Atehortua in prison and informed him that he was going to file a motion for a new trial on Atehortua's behalf. Abbott also informed him that the motion would be at no cost to Atehortua.

In January, 1992, Atehortua wrote to Abbott to complain about the pace of his appeal. Abbott responded on February 3, 1992, that he still planned to file a motion for a new trial based

[8] Between October 31, 1995, and November 10, 1998, Abbott was on either inactive or retired status. He returned to active status on November 10, 1998.

on ineffective assistance of counsel. In April, 1992, Atehortua again wrote to Abbott to inquire as to the status of his appeal and to complain about the slow progress. When Abbott informed Denner of Atehortua's complaints sometime shortly thereafter, Denner, who was anxious to be relieved of the case, suggested that Abbott take over the case and file an appellate brief on behalf of the client in exchange for the $9,000 promised for the appeal.

On May 6, 1992, Abbott wrote to Atehortua on "Denner & Associates" letterhead and informed him that the appellate brief "would be a joint product" of Denner and himself. Abbott signed the letter and forged, or caused to be forged, Denner's signature at the bottom of the letter.

On July 29, 1992, Abbott filed a motion for a new trial on Atehortua's behalf claiming that trial counsel had been ineffective in not reviewing the wiretap tape recordings. The trial judge held a hearing on the motion on October 29, 1993, but Abbott presented no evidence, by way of either affidavit or live testimony, from Atehortua's trial counsel. Consequently, the judge ordered that a further hearing be held to consider testimony from Atehortua's trial attorney on the issue of ineffective assistance of counsel. Abbott took no action to schedule a further hearing and none was ever held. Thereafter, the motion for a new trial languished.

While the motion for a new trial was pending, Abbott's strategy regarding the direct appeal was to seek periodic stays. Abbott and Denner had the responsibility of filing monthly status reports with the Appeals Court between December, 1992, and April, 1994. Abbott assumed primary responsibility for filing these reports. Almost from the outset, he failed timely to file the status reports as required. When the January, 1993, status report was not filed, the Appeals Court issued a notice of dismissal pursuant to its Standing Order 17A. When Denner received the notice of dismissal, he contacted Abbott and asked him to file a status report and a motion to reinstate the appeal, which he did. The Appeals Court allowed the motion, vacated the dismissal, and continued the stay. This sequence (failure to file a status report, dismissal, and reinstatement) was repeated five more times until finally, following a June, 1994, dismissal,

Abbott failed to file a late status report and did not move to vacate the dismissal or request a further stay. By this point, Denner had withdrawn from the case and did not receive notice of the dismissal. Because of Abbott's inaction, Atehortua's appeal was dismissed for lack of prosecution on July 29, 1994. Abbott failed to inform Atehortua of the dismissal.[4]

Abbott had little or no contact with Atehortua thereafter until May, 1995, when Atehortua wrote to Denner requesting information on the status of his case, and sent a copy of the letter to Abbott. Abbott did not respond to the letter but Denner contacted Abbott and, on learning that the appeal had been dismissed almost one year earlier, advised him to file a motion to reinstate the appeal. On June 28, 1995, Abbott filed a motion to reinstate the appeal. The motion was denied by the Appeals Court. Abbott failed to notify Atehortua either that he had filed the motion to reinstate the appeal or that it had been denied.

*The Board's Investigation.*

On August 23, 1995, Atehortua wrote to the Office of Bar Counsel complaining that Abbott had abandoned his duty to file an appeal and requesting an investigation of his case. Bar counsel wrote to Abbott on September 1, 1995, requesting information on the matter, to which Abbott replied that Atehortua's case was "proceeding on a good strategic course." On September 29, 1995, Abbott wrote a letter to assistant bar counsel in which he made two claims that the committee later found to be deliberate misrepresentations. First, Abbott claimed that in a recent visit with Atehortua in prison, accompanied by an interpreter, he had had "a meaningful discussion about his case and the proper strategies to pursue (which, as it turns out, I had been pursuing all along)." And, second, he claimed that Atehortua's "complaint had been taken care of" and "[t]his makes your further requests on this case moot."

On October 24, 1995, assistant bar counsel requested that Abbott bring his file on the case to a meeting with her on November 9, 1995. Abbott rescheduled the meeting and instead

---

[4]Meanwhile, in November, 1993, Atehortua's family had paid Abbott $3,000 to file an appellate brief on Atehortua's behalf. While Abbott accepted this payment, he did not write an appellate brief, nor did he take any action to further Atehortua's appeal.

met with Atehortua on November 9, 1995, this time without an interpreter. He presented Atehortua with a document that read: "I, Oscar E. Atehortua, state that I do not want Attorney Richard Abbott to pursue my appeal at this time. I also do not want anyone to see his file concerning me." Atehortua, who is not able to read English well, signed the document without understanding what it said.

On November 20, 1995, Abbott was interviewed by assistant bar counsel, under oath, and stated that he had written and filed an appellate brief on behalf of Atehortua in August or September of 1995. When bar counsel confronted him with the docket sheet showing that the appeal had been dismissed long before that time, Abbott claimed that allowing the dismissal had been part of his "strategy." In a letter dated November 30, 1995, Abbott informed bar counsel that Atehortua was withdrawing his complaint to the board and that Atehortua did not want Abbott to turn his file over to bar counsel. The committee found that these statements by Abbott were intentional misrepresentations.

Abbott subsequently testified before the committee that it had always been his strategy to allow Atehortua's direct appeal to be dismissed, "expand the record" through the motion for a new trial, and then appeal from the anticipated denial of the motion. The committee did not credit this testimony, finding it to be "a *post hoc* rationalization for his neglect." The committee also found that, in an effort to provide evidence of his alleged strategy, Abbott fabricated a letter to Atehortua, dated August 6, 1994, which read in part:

"I have moved to 60 State Street. Jaime's attorney [Jaime was the codefendant in the cocaine trafficking case] will be pushing [the judge] on the ruling for a Motion for a New Trial. As you know, our ways are more patient and not as aggressive on our Motion. We are not even filing status reports anymore on the appeal."[5]

On December 15, 1995, Abbott retired from the practice of

<hr>

[5] Abbott produced this letter for the first time as an attachment to his motion to reconsider the motion to dismiss the petition for discipline filed on January 13, 1999. It had not been in the client file he had previously surrendered to

law,[6] but did not withdraw as counsel of record from Atehortua's case. By letter dated May 3, 1996, he inquired of Atehortua whether he wanted to proceed on the motion for a new trial, but did not inform Atehortua that he had retired and could no longer represent him. Beginning in June, 1996, Atehortua attempted to get new counsel appointed to represent him on his motion for a new trial. His motion for appointment of counsel was allowed by the Superior Court in August, 1996, but no counsel was assigned to Atehortua until Abbott filed a motion to withdraw on April 28, 1998.

*Discussion.*

A. *Due process.* It is well settled that attorneys facing bar discipline proceedings are entitled to due process protections. *In re Ruffalo*, 390 U.S. 544, 550 (1968). *Matter of Eisenhauer*, 426 Mass. 448, 454, cert. denied, 524 U.S. 919 (1998). Among these protections are the right to fair notice of the charges and the right to be heard. *Id.* at 453-454. *Matter of Ellis*, 425 Mass. 332, 339 (1997). *Matter of Saab*, 406 Mass. 315, 323 (1989). However, as bar discipline proceedings are civil, not criminal matters, *Matter of Jones*, 425 Mass. 1005, 1007 (1997), the respondent is not entitled to the full panoply of constitutional protections afforded to criminal defendants. See *Matter of Eisenhauer, supra* at 454, and cases cited.

Abbott claims that his due process rights were violated because (1) he did not receive adequate notice of all charges against him; (2) bar counsel was biased and negligent with respect to his case; and (3) the admission of a videotaped deposition of the complainant infringed on his right to confrontation.

1. *Notice.* Abbott claims that the petition did not give him adequate notice of what he contends were the "key" elements of the misconduct that he was ultimately found to have engaged in, namely, (1) that he claimed as "strategy" the abandonment of Atehortua's direct appeal only after assistant bar counsel confronted him with the Appeals Court docket entries on November 20, 1995; and (2) that he had Atehortua sign a document that Atehortua did not understand. As to the first, Abbott

argues that the petition is silent on the subject of when his alleged strategy to forgo Atehortua's direct appeal was formulated. This argument misses the point. The petition for discipline alleges that Abbott improperly permitted his client's direct appeal to be dismissed. This allegation put Abbott on notice that all of his decisions and actions regarding the dismissal of Atehortua's appeal, including the timing and communication of such matters to his client, would be subject to scrutiny by the board. The petition gave adequate notice.

As to the second, Abbott contends he had no notice that he would be sanctioned for having Atehortua sign a document that he did not understand because the petition alleged instead that he had given Atehortua a blank piece of paper to sign. As the single justice aptly noted, "The respondent's argument splits hairs too finely. The petition provided him with ample notice that the document he submitted to bar counsel, as proof that his client did not want to pursue his appeal, was being challenged. That is all due process requires. See, e.g., *Matter of Saab*, *supra* at 323-324 (no due process violation when theory of ethical violation changes); *Matter of Looney*, 13 Mass. Att'y Discipline Rep. 445, 465 (1997) (petition pleaded with sufficient particularity where 'the basic factual allegations were made known')." Abbott's ability to mount an effective defense was not impaired by this discrepancy as he was put on notice that he was charged with tricking his client into signing a statement that his client never intended to make. He was aware of the thrust and import of the charge and his ability to defend against it did not hinge on whether he wrote the statement in question before or after he presented the document to Atehortua. In these circumstances, Abbott received adequate notice of the allegations against him.

2. *Bias.* Abbott claims that his due process rights were violated because bar counsel failed to interview an interpreter who was present during one of his meetings with Atehortua, thus demonstrating bias and negligence. The witness, according to Abbott, was an impartial observer who would have confirmed Atehortua's endorsement of the "strategy" pursued by Abbott. However, as this court clearly stated in *Matter of London*, 427 Mass. 477, 482-483 (1998), bar counsel has no obligation to interview a respondent's witnesses. Abbott attempts to

distinguish the *London* case, by arguing that the interpreter was not "his" witness, as he only knew him for a few hours. Abbott's degree of familiarity with the witness is not relevant. He clearly expected the witness's testimony to be favorable to him and this is sufficient to classify the interpreter as "his" witness. See *id.* at 481-482. Further, in a letter dated April 7, 1998, Abbott reported that, when he spoke to him in March, 1996, the witness claimed to have no memory of the discussion with Atehortua and refused to sign an affidavit. Where the interpreter apparently had no exculpatory evidence to offer, bar counsel's failure to interview him was of no consequence to the proceedings.

3. *Admission of Atehortua's videotaped deposition.* Abbott claims that his rights to confrontation and due process were violated when the committee admitted Atehortua's videotaped deposition in lieu of his live testimony. He claims that while Atehortua was incarcerated at the time of his hearing, this did not render him "unavailable" for purposes of avoiding the requirements of the confrontation clause. However, as the single justice pointed out, "there is no established right to confrontation in a bar discipline proceeding." See *Matter of Segal*, 430 Mass. 359, 364-365 (1999); *Matter of Eisenhauer*, *supra* at 454. Moreover, the rules of evidence used in the courts are not applicable to bar discipline proceedings, see Rules of Procedure of the Board of Bar Overseers § 3.2 (2002), and the board's own rules permit the admission of videotaped testimony in the circumstances of this case. See Rules of Procedure of the Board of Bar Overseers § 4.15 (2002) ("At the hearing, any part or all of a deposition . . . may be used against any party who was present or represented at the taking of the deposition or who had notice thereof"). Abbott assented to the videotaped deposition, was present at the deposition along with his attorney, and was allowed to cross-examine Atehortua. Abbott's rights were not violated and there was no error in the committee's admission of the videotaped deposition.

B. *Sufficiency of the evidence.* Abbott claims that many of the findings and credibility determinations made by the board were erroneous and unsupported by the evidence. Indeed, he claims that "[v]irtually every finding in [bar counsel's] favor was clearly erroneous . . . ." The standard of review applicable to

the board's findings is whether there was substantial evidence to support the findings. S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997); *Matter of Wise*, 433 Mass. 80, 87 (2000); *Matter of Segal*, *supra* at 364. Here, the board's findings and decision are fully supported by substantial evidence and we will not disturb its decision.

Abbott argues, in essence, that the committee was unwarranted in crediting Atehortua's testimony over his own and in resolving the conflicting testimony in favor of Atehortua. Such arguments, hinging on the credibility determinations of the committee, generally fall outside the proper scope of our review. See *Matter of Saab*, 406 Mass. 315, 328 (1989), quoting S.J.C. Rule 4:01, § 8 (3), as appearing in 382 Mass. 784 (1980) ("Our rules concerning bar discipline . . . accord to the hearing committee the position of 'the sole judge of the credibility of the testimony presented at the hearing'"); *Matter of Hachey*, 11 Mass. Att'y Discipline Rep. 102, 103 (1995) (hearing committee acts like jury in making credibility finding which may not be rejected unless it can be "said with certainty" that finding was "wholly inconsistent with another implicit finding"). "[A]s long as there is substantial evidence, we do not disturb the board's finding, even if we would have come to a different conclusion if considering the matter de novo." *Matter of Segal*, *supra* at 364.

C. *Other issues.* Abbott makes several other arguments in his brief that consist largely of conclusory statements and claims for which he gives little or no legal authority. He argues that (1) current bar counsel is bound by previous admissions of prior bar counsel; (2) the charges against him cannot stand because Atehortua stated that he could not remember the substance of several "key" conversations he had with Abbott; and (3) he was denied due process when his most germane points were ignored by the board.

The statements to which Abbott would have current bar counsel bound relate to the number of times an attorney should generally meet with an incarcerated client during the course of appellate representation. As the single justice noted: "[Abbott's] remaining argument, that current bar counsel is bound by 'admissions' made by prior bar counsel, is meritless. [Abbott] has failed to demonstrate either that the statements allegedly made

were admissions or that current bar counsel is somehow bound by them."

As to Abbott's argument regarding Atehortua's failure to recall the substance of certain conversations, this was an issue for the committee to weigh in assessing credibility. The fact that Atehortua had forgotten the details of several of his conversation with Abbott went to his credibility as a witness and the proper weight of his testimony. As discussed above, "our rules concerning bar discipline . . . accord to the hearing committee the position of 'the sole judge of the credibility of the testimony presented at the hearing.' " *Matter of Saab*, *supra* at 328.

With respect to Abbott's third argument, that he was denied due process when his most germane points were ignored by the board, he cites no legal authority whatsoever and instead recites four questions that he claims were never adequately addressed by the board. His arguments in this respect do not rise to the level of appellate argument as required by Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), and we therefore decline to address them. See *Commonwealth* v. *Cintron*, 435 Mass. 509, 520 n.5 (2001); *Commonwealth* v. *Salcedo*, 405 Mass. 346, 351 (1989).

*Conclusion.*

As the single justice stated, quoting *Matter of Clooney*, 403 Mass. 654, 657 (1998), "[Abbott's] neglect of Atehortua's case, combined with his various misrepresentations to his client and to bar counsel, and his fabrication of documentary evidence, demonstrate a 'persistent and extended pattern of improper and unethical behavior . . . .' " There is substantial evidence in the record that Abbott (1) failed diligently to pursue postconviction relief for his client; (2) intentionally misrepresented the status of the case to bar counsel; (3) misrepresented the contents of a document to his client in order to induce him to sign it; and (4) fabricated evidence in order to mislead bar counsel. In light of this evidence, we affirm the decision of the single justice, carrying out the recommendation of the board, to suspend Abbott from the practice of law for a period of two and one-half years.

*So ordered.*

# EXHIBIT B



August 12, 2002

Re: In Re Abbott, SJC: 8649, Petition for Rehearing

Dear Chief Justice Marshall:

There are numerous relevant factual issues combined with legal issues that I raised that I feel the full panel misstated or misunderstood regarding Due Process.

While the proceedings were "quasi criminal" in nature I never sought the full protections of a criminal defendant. I would have been more than content with the standard of a fair preponderance of the evidence and the safeguards afforded a civil defendant, which is long established in these proceedings. In Re Mayberry, 295 Mass. 155, 3 N.E. 2d 248 (1936).

The August 1st ruling did not address the Due Process point I raised of being afforded no discovery. The BBO deposed me four times as well as subpoenaing my computer and printer. I was not allowed any discovery, not even nine interrogatories which addressed key charges against me, such as was Atehortua claiming I had him sign a blank document (as it turned out this was purely an invention of the BBO). Have you ever heard of a civil case where one side is allowed to depose the defendant four times, plus subpoena their files (as I kept all the files on my computer) while the other side is denied even the most rudimentary discovery? As I stated, even in a civil case, a basic tenet of due process is fairness and the right to be heard in a meaningful way. North Star Contracting Cor. v. Long Island Rail Road Co., 723 F.Supp. 902 (E.D.N.Y. 1989). Due process protects every accused from unfair treatment by the government. United States v. Romano, 583 F.2d 1.2. (1st Cir. 1978).

While lopsided discovery is unfair in every case, discovery was particularly important in this case as the BBO constantly changed their theory of the case. It was also especially important as the three most serious charges the BBO leveled against me were charges that not even Atehortua claimed – Abbott never made a Motion for a New Trial, Abbott had Atehortua sign a blank document, and Abbott forged Denner's signature. All these will be addressed in a moment. It was also important as Atehortua at his May 5, 1999 deposition, just a few weeks before the hearing began on May 28, 1999, forgot the key elements of the gravaman of the offense against Abbott.

While forgetfulness, real or feigned, may not always be determinative of a case, it was in this case if mere civil law standards were applied. At his deposition, Atehortua stated he was sure Abbott discussed with him the Motion for a New Trial, he just couldn't remember exactly what. If this were a civil case hinging on, say, whether there was an oral contract and the defendant said there was an oral contract, the plaintiff knew all about it. What if the plaintiff testified at his deposition, I'm sure discussions occurred about an oral contract, I just can't remember what. Would this be enough to go forward with the civil case? Would this be enough to go forward with the case when the defendant was afforded zero discovery?

As to the BBO constantly changing their theories of the case, for length reasons I will highlight only one important theory on which they changed their theory – whether I improperly allowed Atehortua's direct appeal to be dismissed.

At my first deposition with the BBO on November 20, 1995, bar counsel Toyloy approved of my theory of passing on the worthless direct appeal, seeing how the Appeals Court ruled on co-defendant Jaime's appeal and then using that as a guidepost for Atehortua's appeal from denial for the Motion for a New Trial. Toyloy approved of this theory provided it was done in a timely fashion.

YT: So what are you going to do? , just let it [motion for a new trial] sit like that?

RA: Well, that …that was the strategy. When … if Jaime –

YT: For how long?

RA: Well, the appeal is pending right now. I believe it's –

YT: The appeal is dead.

RA: Jaime's appeal.

YT: Right.

RA: Is going to be argued December 1st, is my … is my understanding
                                   (Nov. 20, 1995 depo, p. 25).

Toyloy went on to another point, as I was right, Jaime's appeal was going to be argued in December. Most importantly, she did not question my strategy or claim I had acted improperly in allowing Atehortua's worthless direct appeal to be dismissed.

Several months later, May 15, 1996, at Denner's deposition, Toyloy also approved of the strategy. Denner made the point that Oscar was in better shape now re his post conviction relief. Toyloy responded, "Yes, I understand that…" She was not concerned with my strategy. At the end of the deposition she was concerned that I hadn't made a Motion for a New Trial. That was the only thing she wanted Denner to telephone me about.

Nine days later, May 24, 1995 at my second deposition, my strategy now made, "…no sense, period…" (p.46). What changed? What changed was that the BBO discovered that I had made a Motion for a New Trial. That issue was never raised again. With their pet theory gone they changed their theory of the case in midstream. What I had now done wrong was not to pursue a worthless direct appeal. The SJC claimed that early on in reviewing the transcripts of Atehortua's trial, Denner and I decided there was definitely something worth pursuing. The panel then cited three issues, none of which could have been raised on direct appeal: the two Oscar theory, the Motion to Suppress trial counsel should have filed, and not getting tapes to the wire taps in Spanish. All could only have been pursued with a Motion for a New Trial, and were by both attorney Adam Nussenbaum and myself. The Appeals Court thought so little of Jaime's appeal and Motion for New Trial they applied appellate rule 1:21.

At his deposition Denner commented to Toyloy, "This is essentially a losing appeal without an expanded record".

The BBO's action on this issue became even stranger and more inconsistent. From May 24, 1995 until February 22, 1999 the BBO theory was that I followed a poor strategy and that I was negligent. On February 22, 1999 the BBO stated they were going to get an expert witness to prove I was negligent at the hearing scheduled to start in just a few months. At that point I asked the hearing committee chairman if I could have some extra time to find my own expert witness as this case had been going on for almost four years and this was the first time an expert witness was ever mentioned by the BBO. I was granted an extra week to find an expert witness on the subject of negligence.

On May 5, 1999 Oscar Atehortua was deposed. Then the BBO did something nasty. They changed the theory of the case several days later. On May 10, 1999 they made a Motion in Limine to exclude my expert witness, as they were now conceding I was not negligent. On May 28, 1999, the day of the hearing, they argued this Motion just prior to opening statements. The full panel of the SJC is factually incorrect when they claimed I missed the point that the petition for discipline alleges that I improperly permitted Atehortua's direct appeal to be dismissed. It is true I claimed that part of the petition was nonsense. The BBO on May 10 and May 28 agreed with me, as they wanted to concede I was not negligent so as to exclude my expert witness who would say that my theory was not negligent, it provided Atehortua with the best of both worlds. With all the funds of the state behind them, the BBO could not find an expert witness to say I was negligent.

The BBO also agreed that my theory was fine on November 20, 1995 and May 15, 1996. Between the bookends of approving of my theory in 1995,1996 and May of 1999 the BBO took a three and a half year hiatus and claimed my theory made no sense. This is worse than anything in Kafka where the accused does not know with what he is being charged. It is so absurd that it is closer to Woody Allen's parody of Kafka, which goes something like, "Today J. and I became engaged. Once we are married she promises she'll tell me her full name".

A few weeks ago I came across a passage by Pulitzer prize winning playwright David Mamet. He wrote a novel, *The Old Religion*, about historical events in 1914 in Georgia, the trial of Leo Frank. Except for the similarity of tactics used against us and that we were both wrongly accused, I am in no way comparing my plight to that of Leo Frank, a man who was wrongly convicted of rape and murder, sentenced to life in prison but before he could serve his sentence was lynched.

Mamet wrote: "He had heard the Yiddish curse, 'May you be involved in a lawsuit when you're right.' And now he understood it.

"He saw that the wrong side could and would allege anything, unbound by the laws of probability or reason, while the legitimately injured side, the wrongly accused, could only allege the undramatic fact of its injury or innocence...and that he, as the accused, no more enjoyed the presumption of innocence than had any unpopular man at any time."

Again, I am not asking for the presumption of innocence, just that the BBO prove their case with the burden of proof needed in any civil case. The BBO making a Motion in Limine after Atehortua had been deposed and changing the theory of the case, was a dirty trick because attorney Sheketoff's cross examination of Atehortua at the deposition would have been different in tone and intensity if he had known the theory the BBO was going to follow just a few days later. Nothing at Atehortua's deposition changed the

theory of negligence. Atehortua, while clever, was hardly a legal scholar who could or would have testified to theories of negligence. Atehortua did say something that changed a BBO theory – he testified he never signed a blank document that the BBO alleged I presented to him. Yet the BBO did not make a Motion in Limine on that point, or a Motion to Amend their petition. There is a lot of merit to my contention that the BBO was biased and that I had no reason to know they would be charging me with things that weren't on the petition.

A corollary to this point is where sufficiency of evidence and due process dovetail. An experienced attorney such as Sheketoff had no reason to expect that once he killed and buried an issue it will resurface, especially as his client was never charged with that particularly violation. Sufficiency of evidence comes into play due to Atehortua's many lies about this. His letter to the BBO starts off with a lie. He claimed he could barely speak English. I produced a tape, which I found in 1999, that revealed Atehortua speaking English so well concerning a drug deal that he used code words with convicted drug dealer Patrick Sealey. Despite Atehortua admitting at his deposition that it was he speaking to Patrick Sealey on the tape, the BBO sought to exclude this tape on the grounds that it wasn't Atehortua voice. They never heard Atehortua's voice speaking English because he always represented to them, "No habla". *"the wrong side could and would allege anything, unbound by the laws of probability or reason"*.

In his letter to the BBO Atehortua claimed he thought he was signing an agreement so that I would keep working on the case. At his deposition, Atehortua claimed he thought he was signing a document to get Judge Mulligan to act. At the May 7th argument before the bench, bar counsel Rabe claimed the discrepancy was due to a mistranslation. She said she had contacted the translator, Jose Lincoln Rodriquez, and he had explained it adequately. It would have been nice to have seen an affidavit or even a letter from Rodriquez to that effect. Even such a document would have to be questioned. I know maybe twenty words in Spanish and my spelling in that language is even worse. But I know enough to realize that attorney (abrogato) Abbott sounds nothing like judge (juicie) Mulligan in either English or Spanish.

Meanwhile, the hearing committee found that my strategy of passing on the direct appeal, while sound, was a post hoc strategy concocted on November 20, 1995 when bar counsel Toyloy confronted me with the docket sheets. This despite the fact that Denner testified that in June of 1995 I told him I was not pursuing the worthless direct appeal and only pursuing the appeal on the possibly meritorious Motion for a New Trial.

Denner, like Toyloy, had no problem with that. He was concerned that I was opening myself to a false claim by Atehortua. He urged me to file a direct appeal and then have it *withdrawn* (May 15 depo, p.20). He never thought my strategy was wrong, rather that I should do some procedural things to protect myself. His suggestion that I file a Motion to have the appeal reinstated and then withdraw it is corroborated by the appellate record. I did in fact file such a motion, which was denied.

On September 29, 1995 the day after I visited Atehortua at MCI Norfolk with an impartial translator (I acquired the name of the service that employed him from the Yellow Pages), I wrote to Toyloy and told her that Atehortua was well aware of the strategy I had been following and he approved of it. I also urged Toyloy in letters of October and December of that year to contact the impartial translator. Why she didn't I do not know.

The record therefore reveals that in June of 1995, months before my November meeting with Toyloy, and in a letter of September, weeks before the meeting, I was pursuing the strategy of passing on the worthless direct appeal. Yet even the immutable laws of time are turned upside down for the BBO who charged I first came up with this strategy, post hoc, on November 20 after Toyloy confronted me with the docket sheets. *"Unbound by the laws of reason or probability"*. Basic due process demands the right to be heard in a meaningful way. Here as with Atehortua not being able to remember whether we discussed the ramifications of the Motion for a New Trial, the party with the burden of proof can not succeed when any element is left to conjecture, surmise or hypothesis. <u>Sorensen v. Evans</u>, 28 Mass. App. 81 (1984). This case is far worse. The laws of physics must be ignored. See also <u>United States v. Czubinski</u>, 106 F.3d 1069, 1073 (1st Cir. 1997).

Before I leave this point, I want to say that in March of 1996 when I realized the BBO was not going to act in a timely fashion, I contacted the impartial translator. At that time he did not remember the details of the conversation with Atehortua. It is understandable, perhaps predictable, that a busy person would forget specific details from half a year before. This makes it all the more important for the BBO to have acted in a timely way. He no doubt would have remembered events if he was contacted a week or two, or maybe a month or two after the event. After all, he repeated the conversations twice, once in English and once in Spanish. The BBO forever prejudiced me with this crucial witness by contacting him for the first time three years after 1995.

The panel says the BBO has no duty to investigate a witness, citing <u>Matter of London</u>. Yet <u>London</u> is easily distinguishable. <u>London</u> concerned four peripheral witnesses. One of the four was so peripheral that his testimony did not technically become relevant until after he died. In the present case, the impartial translator would have settled the case one way or another. "Yes, Atehortua was clearly familiar with Abbott's strategies and whole heartedly approved of them", or "No, Abbott never discussed passing on the worthless direct appeal, or he did but Atehortua was adamantly opposed to it".

The SJC also says that since the impartial translator would have had favorable things to say on my behalf, he was my witness. Using that logic, does that mean that the tape of Atehortua speaking English should not have been introduced since it was favorable to me. Or that any piece of evidence, no matter how vital, did not have to be pursued by the BBO even if all they had to do was make a phone call, because it might be favorable to the petitioner, or, better yet, settle the case. Isn't there a basic duty to investigate? It would seem a basic denial of due process and fundamental fairness where one side can be disbarred for not investigating, <u>In re Kerlinsky</u>, 428 Mass. 656, while the other side has no duty to make even a phone call to the key witness, especially as they have the burden of proof. Why didn't they contact the impartial translator in a timely manner? A reason is provided by the First Circuit in a recent well-argued and well-reasoned decision concerning whether a drug deal was within 1,000 feet of a school. The government did not take a full measurement. "If that measurement would have favored the government, it is hard to imagine why the government did not take it". <u>United States v. Soler</u>, 275 F.3d 146 (1st Cir. 2002).

With all the questionable tactics of the BBO, and their changing the theory of the case after Atehortua had been deposed, it was especially important that I had the right to

question him at the hearing. From the outset when attorney Sheketoff objected to Atehortua's videotaped deposition being introduced in full, the objection never has been that the BBO didn't have the right to depose him or any one else. The objection then and now was there was no showing he was unavailable. Even in a civil trial, a deposition isn't allowed in unless both parties agree or unless there's a showing that the deposed party was unavailable. No such Motion was made by the BBO. Also, the party seeking to introduce the deposition gives notice to the other side what portion or portions of the deposition they are seeking to introduce. No such notice was given. Given that these basic rules weren't comported with and that the entire theory of the case changed after Atehortua's deposition and just weeks before the hearing was to begin, I was not allowed to properly confront the complainant.

The SJC also noted that the Appeals Court sent me several 17A notices and that finally I let the direct appeal be dismissed in 1994. They didn't note that the last directive by the Appeals Court was that no more continuances would be allowed as they were no longer serving a useful purpose. That was the logical place to stop I thought. If I had made a motion to allow me to keep getting continuances, the BBO would no doubt question that, claiming why would I do that if I didn't want to pursue the worthless direct appeal. Bar counsel Toyloy, an experienced appellate attorney, never raised this issue of the 17As or questioned me about it in 1995 or 1996. The first time this was raised was by the second wave of bar counsel and bar investigator at my third deposition in March of 1998. I told them there were good reasons for acting that way, probably to separate Oscar from his more culpable co-defendant, or maybe other reasons but I honestly didn't remember a procedural tactic from years ago.

This "can't win for losing" tactic of the BBO was evident in other areas. At the end of Denner's deposition, Toyloy actually complained that I visited Atehortua too many times, six times in all from 1991 through 1993. She could see visiting a client once, maybe twice. Denner disagreed. He said an attorney should visit a client several times. Abbott wanted to be painstakingly clear that Atehortua understood everything. Current bar counsel feels I didn't visit Atehortua enough even though the strategy in the later phase was to wait for Jaime's appeal to be decided. What would have been the purpose of a visit or a letter saying, "Still waiting".

Because of time considerations of the fifteen minutes I was allotted to argue my case, as well as a Motion to introduce my brief of June 1995, I did not mention my correspondence to Atehortua. The pattern of his letters shows that he knew our strategy was to wait for Jaime's appeal to be decided. This point must have bothered bar counsel because she mentioned it and outright lied about it. If you check the tape of her oral argument she said that *all* of Atehortua's letters to me mention the direct appeal and not the Motion for a New Trial. Pretty much the reverse is true. After his first few letters, which asked for a copy of his transcripts and to highlight a few issues from his trial, the letters and my visits concern the Motion for a New Trial.

On February 15, 1993 Atehortua wrote to me to take measures "to inform the appeals court that Judge Mulligan refuses to make a decision on the motion for a new trial." That is, on granting us a hearing date. No mention was made of a direct appeal. For the next several months attorney Nussenbaum and I wrote letters, telephoned, and I visited the Superior Court several times to get a hearing date. On July 1, 1993 Atehortua wrote me to request I "prepare a mandamus to the Appeals Court to have Mulligan decide

on this matter." (of delaying the Motion for a New Trial). Again, there was no mention of a direct appeal. Just ten days later, July 11, 1993, Atehortua wrote me about some research he uncovered about a recent Supreme Court case about reasonable doubt. He did not mention the direct appeal or ask that I include this issue in his direct appeal. Rather, "So please file a motion to amend the present motion for new trial in the superior Court to include this issue."

Why would bar counsel misrepresent these letters? What happened next in the sequence of events is even more revealing. While Atehortua was proactive and high spirited about his Motion for a New Trial, he never again mentioned or wrote about his direct appeal from mid 1993 until May of 1995, a year and a half later. It is uncontested he never wrote or called me during those eighteen months, nor did any of his family or representatives. It is also uncontested he never tried, so it wasn't a matter of he couldn't find me. That issue wasn't raised until May of 1995. Atehortua's silence on the issue of the direct appeal for a year and a half, contrasted to his writing letters within a ten day span about his Motion for a New Trial speaks as loudly about what he knew as any letter he could have written to me verifying he knew we were going to pass on the worthless direct appeal.

The number of letters I wrote to him, the six visits between 1991 and 1993, the five drafts I wrote on his Motion for a New Trial (four in my file plus the final draft I submitted to Judge Mulligan) speaks to a related issue. The BBO claimed I was motivated by avarice in this case. Yet it is uncontested I was charging Atehortua a flat fee. Why would I spend all those hours on drafts, visits, and letters if my goal was to make the most money for the least amount of work. If that were the case I would have visited him once and wrote one draft. The facts show I was conscientious despite what the BBO alleged.

A related theory was that I was trying to divide Denner and Atehortua, that Atehortua genuinely liked Denner. This despite Atehortua's April 24, 1992 to me dismissing Denner and complaining about being overcharged. Atehortua wrote, "In fact I want to know what happened to the initial NINE THOUSAND DOLLARS THAT I GAVE TO JEFFREY DENNER. I want to draw up our own contract with the specified balance owed of $9,000." (emphasis in the original). I replied with a pointed letter that ended by calling him a mal content and for the remaining $9,000 he could find another lawyer. "Or you could do it with the help of your friends or by yourself. This way you could get all the credit for the success and have no one but yourself to blame for an unfavorable result." Hardly the letter of an attorney who was motivated by the $9,000.

Yet many of these issues were legal vampires. You couldn't kill them. As late as his deposition on May 5, 1999, Atehortua was still claiming he wasn't mad at Denner for overcharging him and that it was Abbott who divided them by saying to Atehortua "Forget about Denner, I'm your attorney now". Sheketoff asked, "If Abbott was saying forget about Denner, why didn't you complain to Denner?" Atehortua responded, "I couldn't answer that".

Another related theory to my alleged avarice was that even after I was inactive I was still trying to extract money from Atehortua via two letters I wrote him shortly after Jaime's appeal was denied. The first letter in April of 1996 informed Atehortua that Jaime's appeal had recently been denied. I did not mention I was inactive because in November of 1995 I had told the BBO I was inactive, I naturally thought they'd

communicate that to Atehortua in a timely fashion. At the beginning of my May 1996 deposition Toyloy concedes I told her in November of 1995 that I was inactive. At the hearing, bar investigator Flores testified she knew I was inactive in November of 1995 and she told Oscar several months later (I don't know why there was such a delay).

What a fuss the BBO would have put up if I never wrote to Oscar about Jaime's appeal being denied, especially as waiting for that denial was a key point in the strategy. Atehortua did not respond to that letter. As a courtesy I wrote to him a month later. As I was writing the letter it occurred to me that given how inept the BBO had been they may not have told him I was inactive, so in the May 3,1996 letter I mentioned that. Has any justice every heard of a dunning letter for money that doesn't mention money or any synonym for money, that doesn't mention an amount, that doesn't mention a time frame, and that informs the person that the attorney is no longer active? Admittedly the letters should have been better written and more specific. But not writing a perfect letter is not an ethical violation. I will be the first to admit that unfortunately I can't write like Hemingway (once again proving the importance of being Ernest).

Another theory of the BBO that concerned my alleged avarice was that I forged Denner's signature on a May 6, 1992 letter to get Atehortua to keep working with me. But as Denner said when I told him that, "Why would you use my name as an endorsement, Atehortua didn't like me?" Why indeed?

Remember, the May 6th letter was just two days after my pointed May 4th letter to Atehortua telling him to get another attorney or do it himself. Why would I sign a conciliatory letter within forty-eight hours unless there was an intervening force, in this case attorney Denner. Denner was on the hook to do the case well. He had already received $9,000; I had received nothing then. He also testified that the Atehortuas had been his clients in the past and he was good at getting and retaining clients.

It is true Denner testified it wasn't his signature on the May 6th letter. He also testified he was often not in his office. He had tried cases in forty (40) states. At times his secretary even signed his checks. That's the so called evidence against me. Denner didn't sign most of his letters, he didn't sign this one either, therefore I must have done it although it is contrary to human motivation and defies logic.

This same type of reasoning was used in my so called recent contrivance letter of August 1994. Toyloy and Flores couldn't remember any documents from my case. They testified they couldn't even remember if the documents in the case were closer to five (5) or two hundred (200). So that's the evidence in that issue, Toyloy and Flores didn't remember the August 1994 letter, they also didn't remember any other document, therefore it must be a recent contrivance.

I don't doubt the sincerity of Toyloy or Flores when they said they couldn't find that letter in their file. The fact is they are the same duo that insisted I never made a motion for a new trial as late as May 15, 1996 despite my writing to them in October of 1995 that there was a motion for a new trial and I provided the names of the people at the hearing. Why they didn't speak to attorney Nussenbaum or Oscar Atehortua about the hearing I don't know. Why they waited over eight months to call the clerk of courts to verify I made a motion for a new trial, I also don't know. They were also so disorganized and lackadaisical that they never called the impartial translator or even attempted to.

More importantly, my computer and printer were subpoenaed to show that the 1994 letter was a recent contrivance from 1998 or 1999. An expert on computers at the

BBO was used to investigate the hard drive and memory of my printer, which I bought in 1991, and my latest computer, which I bought in 1996 or 1997. The BBO expert concluded the letter was not a recent contrivance and he was never called by the BBO at the hearing to testify. In short, the BBO had to disavow their own expert witness in order to proceed with their theory.

One more important piece of evidence about the August 1994 letter is that I citied it almost verbatim at my May 24, 1996 deposition. That was a contentious hearing and virtually everything I said was challenged. Why didn't Toyloy or Flores ask, "You mentioned three sentences, is this out of context in a five page letter or is it a three or four sentence letter?" They didn't ask because the letter was right in front of them. Why didn't they ask, "How come we have copies of all your letters except this one?" Well, the reason is obvious. The current BBO theory is that I read the transcript of the May 24, 1996 deposition, saw that I mentioned an August 1994 letter and then decided to write one in 1999, dating it August 6, 1994. Honest. Current bar counsel has more nerve than a root canal.

At the hearing, bar counsel contended that I never informed the post office of my change of address from 121 Mount Vernon Street to 60 State Street. I stated that I had but I also frequently checked back at 121 Mount Vernon Street in case a letter had slipped past the post office and their change of address system. Bar counsel moved off this point. Again, this was representative of the tactics they used against me. They could ask any question, even though they had the burden of proof, not check with the post office or any one else, throw mud and move on without consequence when their misguided theory was refuted.

One last point on Sixty State Street.. It is uncontested I wrote to Atehortua about all my address changes, including ones that were just to business identities. Why wouldn't I inform him when I moved to an actual office at Sixty State Street, one of the most prestigious addresses in Boston? I told people I didn't even know I was at Sixty State Street.

One thing in hindsight that I would have done differently was to immediately withdraw once I became inactive in 1995. But my staying on the case wasn't motivated by greed or ill will to my client, just the reverse. When the BBO wrote me in the Spring of 1998 to withdraw I wrote them back that I have stayed on because I feared that if I withdrew and Atehortua wasn't represented the prosecutor could make a Motion to Dismiss unopposed, or opposed only by Atehortua pro se. Attorney Rabe wrote back that she felt by not withdrawing I was in violation of the SJC rules. I quickly made a Motion to Withdraw. What is most important about my staying on until the Spring of 1998 is that from November 1995 until the Spring of 1998 no one from the BBO asked me to withdraw. No one from any court asked me to withdraw. No one from CPCS or any agency asked me to withdraw. No one from Oscar's family or a representative asked me to withdraw. And most importantly, Oscar never asked me to withdraw, which I would have done immediately upon request. No one asked me to withdraw until 1998.

Finally, to wrap up a few loose ends. The SJC correctly points out that I told Atehortua his Motion for a New Trial would be free. What does that have to do with the appeal from the Motion for a New Trial or the cost of that? It is indicative of how lax the hearing committee was about evidence. For instance, they claimed Atehortua paid me $3,000 in November of 1993. There is no evidence for that other than Atehortua's say

so. I said it's possible, or it could have been sometime in 1992 or Spring of 1993, I really don't remember. So the hearing committee is basing their conclusion on possibly triple or quadruple hearsay. Atehortua told me, and the petition alleges, that his cousin paid me. At the deposition he said it was actually his girlfriend's brother who paid me. Atehortua lied about big things, small things, things that mattered and things that didn't. So how did he find out I was paid $3,000. No one knows. Was it from the brother, the girlfriend, who was told by her brother, his cousin who was told by his girlfriend who was told ... The point is how quickly the hearing committee was willing to abandon 500 years of English and American law on hearsay.

Another evidentiary point concerns a letter Atehortua allegedly sent me. The hearing committee said Atehortua was an unreliable witness. They called his testimony "confused and confusing" and weren't going to credit his testimony except where otherwise noted (paragraph 16, hearing committee report). Yet they credited four versions in about three minutes of this confused and confusing witness about the alleged letter. According to Atehortua the letter was in turn burned, lost, returned to him – why would he keep a returned letter, and finally, there was an existing copy. Jose Lincoln Rodriquez probably had it and Oscar would get a copy and send it to us. We are still waiting. While neither the payment, allegedly in November or the alleged letter are big matters, it is emblematic of how far the hearing committee was willing to go to credit insufficient evidence and deny me due process.

When I told Denner that the BBO was charging me with not telling Atehortua that I was passing on his direct appeal, Denner responded, "So what, I don't tell my client things all the time. Part of what I'm getting paid for is to make executive decisions". I told him in principle I had no qualms with what he was saying but that's not how it happened. Oscar knew about the strategy. I wasn't going to lie even if it meant taking the more arduous route.

At the end of the day, I took the more difficult, honest route. I gave Atehortua the best chance to succeed and which now even the BBO concedes my theory was sound.

On the other hand, to go forward with their case the BBO did the following, and more: repudiated their own expert computer witness, disavowed Atehortua's admissions about him speaking English on tape, contended I had Atehortua sign a blank document and not asking Atehortua about this even though she visited him twice in prison before filing the petition, insist I forged Denner's signature on the flimsiest evidence that was contrary to logic and motivation, failed to get an expert witness on negligence, changed the theory of the case after Atehortua had been deposed, misrepresented facts to the SJC, and refuted the laws of time, logic and reason.

When I discuss poor Leo Frank with people they agree what happened was disgraceful but, hey, that was Georgia in 1914. It is shameful the same tactics were used against me in Massachusetts from 1995-2002.

Respectfully submitted,

Richard Abbott

-10 of 10-

# COMMONWEALTH OF MASSACHUSETTS
## SUPREME JUDICIAL COURT

### NOTICE OF CHANGE OF ADDRESS

Please be advised that my official address is the one I've maintained since the

1980s: Richard Abbott
314 Harvard Street
Brookline, MA 02446
(617) 783-0125

*Richard Abbott*

### Certification

I certify I sent a true copy of the above to bar counsel Jane Rabe, 75 Federal Street, Boston, MA 02110, first class mail, postage prepaid.

*Richard Abbott*

# EXHIBIT C

# SUPREME JUDICIAL COURT
## for the Commonwealth
### Case Docket

---

### IN THE MATTER OF RICHARD D. ABBOTT
SJC-08649

---

### CASE HEADER

| | | | |
|---|---|---|---|
| **Case Status** | Pet'n rehearing denied | **Status Date** | 09/06/2002 |
| **Nature** | fraud | **Entry Date** | 09/26/2001 |
| **Appellant** | Defendant | **Case Type** | Civil |
| **Brief Status** | | **Brief Due** | |
| **Quorum** | Marshall, C.J., Greaney, Ireland, Spina, Sosman, Cordy, JJ. | | |
| **Argued Date** | 05/07/2002 | **Decision Date** | 08/01/2002 |
| **AC/SJ Number** | BD-2001-045 | **Citation** | 437 Mass. 384 |
| **DAR/FAR Number** | | **Lower Ct Number** | BD-2001-045 |
| **Lower Court** | SJC for Suffolk County | **Lower Ct Judge** | Judith A. Cowin, J. |
| **Route to SJC** | Direct Entry: Appeal from Single Justice Order/Judgment | | |

---

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Bar Counsel**<br>Plaintiff/Appellee<br>Red brief & appendix filed<br>18 Main Br., 18 App.<br>2 Extensions, 35 Days | Jane R. Rabe, Ass't Bar Counsel<br>Daniel C. Crane, Bar Counsel<br>Michael Fredrickson, Board Counsel |
| **Richard Abbott**<br>Pro Se Defendant/Appellant<br>Blue brief filed<br>18 Main Br.<br>2 Extensions, 8 Days | |

---

### DOCKET ENTRIES

| Entry Date | Paper | Entry Text |
|---|---|---|
| 09/26/2001 | #1 | Entered. Notice to counsel. |
| 10/01/2001 | #2 | Copy of the Single Justice's order denying stay pending appeal. (FILED) |
| 10/18/2001 | #3 | ORDER (Cowin, J.), noting Bar Counsel's opposition to motion for 90-day Stay; Motion for 90-day Stay DENIED w/out a hearing. Notice sent by single justice clerk. |
| 10/31/2001 | #4 | Copy of Order (Cowin, J.): This matter came before the Court...on a motion for reconsideration of the denial of the motion for stay of execution of judgment for 90 days filed by the respondent on 10/5/01. After reconsideration it is ORDERED that the motion for reconsideration be...denied. Notice sent by single justice clerk. |
| 11/13/2001 | #5 | MOTION to extend to November 13, 2001, filing of brief of Richard Abbott by Richard Abbott. (ALLOWED). Notice to counsel. |
| 11/13/2001 | | ALLOWANCE of Paper #5 to 11/13/2001 for filing of brief of Defendant/Appellant Richard Abbott. No further enlargements anticipated. Notice to counsel. |
| 11/13/2001 | #6 | SERVICE of brief for Defendant/Appellant Richard Abbott by Richard Abbott. |
| 12/05/2001 | #7 | MOTION to extend to 1/12/02 filing of brief of Bar Counsel by Jane R. Rabe, Ass't Bar Counsel. |
| 12/07/2001 | | ALLOWANCE of Paper #7 to 01/14/2002 for filing of brief of Plaintiff/Appellee Bar Counsel. Notice to counsel. |

| | |
|---|---|
| 12/17/2001 #8 | Copy of Single Justice docket entry: Motion to Reconsider Stay of Judgment DENIED w/o hearing. (Cowin, J.) |
| 01/11/2002 #9 | SERVICE of brief & supplemental appendix for Plaintiff/Appellee Bar Counsel by Jane R. Rabe, Ass't Bar Counsel. |
| 02/15/2002 #10 | NOTICE of April argument sent. |
| 03/01/2002 #11 | MOTION to Enlarge Time for Oral Argument filed for Richard Abbott by Richard Abbott. (DENIED. By the court.) Notice sent. |
| 03/04/2002 #12 | ORDERED for Reserve Argument on April 1. Notice sent. |
| 03/11/2002 #13 | MOTION to Introduce new evidence, filed for Richard Abbott by Richard Abbott, Pro Se. (Referred to quorum). Notice sent. (Note: Brief from a jury guilty verdict in Suffolk County before Judge Mulligan, received on 3/14/02 as an attachments to this motion, see paper no. 16.) |
| 03/11/2002 #14 | NOTICE of May argument sent. |
| 03/13/2002 #15 | OPPOSITION to Paper #13 (Appellant's motion to introduce new evidence), filed by Bar Counsel. (REFERRED TO QUORUM) |
| 03/14/2002 #16 | 18 copies of a brief from a jury guilty verdict in Suffolk County before Judge Mulligan received from Richard Abbott as an attachments to his Motion to Introduce New Evidence (paper no. 13). |
| 04/05/2002 #17 | ORDERED for argument on May 7. Notice sent. |
| 05/07/2002 | Oral argument held. (CJM G I S SN CY). |
| 08/01/2002 #18 | RESCRIPT (Full Opinion): The decision of the single justice, carrying out the recommendation of the Board of Bar Overseers, to suspend Richard D. Abbott from the practice of law for a period of two and one-half years is affirmed. (By the Court) Reasons as on file. Notice sent. |
| 08/15/2002 #19 | PETITION FOR REHEARING, filed for Richard Abbott by Richard Abbott. |
| 09/06/2002 #20 | DENIAL of petition for rehearing. (By the Court) Notice to counsel. |
| 09/06/2002 | RESCRIPT ISSUED to trial court. |

As of 06/25/2004 01:01